UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JUAN CARLOS STRONG                                    CIVIL ACTION


VERSUS                                                No. 17-7625


SHELL OIL COMPANY, ET AL.                             SECTION: "J"(5)


**ORDER AND REASONS**

Before the Court are *Motions for Summary Judgment* filed by Shell Pipeline Company LP ("Shell") **(Rec. Doc. 30)** and Tailing International, LLC ("Tailing") **(Rec. Doc. 33)**. Plaintiff, Juan Carlos Strong, has filed opposition memoranda responding to Shell (Rec. Doc. 39) and Tailing (Rec. Doc. 40), respectively. Tailing filed a reply. (Rec. Doc. 42). Considering the motions, the memoranda, the record, and the law, the Court finds that Tailing's Motion should be **GRANTED** and Shell's motion should be **DENIED**.

**FACTS AND PROCEDURAL BACKGROUND**

The heart of this dispute is a fall that Strong suffered while working on an offshore platform in federal waters within the Gulf of Mexico.[1] Shell owned and operated the platform. Shell hired Strong's employer, Quality Construction & Production ("QCP"), to do sandblasting and painting on the platform.[2]

---

[1] (Rec. Doc. 30-1 at 1).
[2] (Rec. Doc. 30-1 at 1).

On the morning of May 12, 2017, Strong was working as a sandblaster on the platform. He traveled to the tool shed—recently moved to a new location—with two other QCP employees, Juan Reyes and Salvador Hernandez.[3] The three were walking from the shed towards the breakroom when Strong stepped in a small gap in the grating at the top of a short, improvised stair formed from gratings and a beam standing at different elevations.[4] He fell forward, and when he did so he attempted to stop his fall by sticking out his left hand.[5] Strong was injured and has since undergone six surgeries he alleges were necessary because of the injuries he sustained in the fall.[6] Pictures taken after the incident offered as summary judgment evidence reveal that the steps are marked with red paint that is clearly visible to anyone going up—but not down—the stairs. The parties, however, dispute whether the red markings were there at the time of the accident.[7] The step below the one that tripped Strong is painted yellow in part and this marking would have been visible to Strong.

---

[3] (Rec. Doc. 30-1 at 1-2).
[4] The gap appears to be approximately three inches wide, four inches long, and 1 inch deep. (*See* Rec. Doc. 30-7 at 27-32). The 1-inch thick grating that forms the top stair completely overlays solid steel. Thus, if anyone were to step in the gap, that person's foot would fall only an inch before coming to rest on the steel platform below. It is obvious, though, that someone could be put off balance if their foot slipped partly into the gap. The edge and only the edge of the top-level grating is painted or marked red so that someone can see the red while stepping up but not down the stair. The second step is approximately 6 inches below the first and is also made from grating. (Rec. Doc. 39-4). It runs approximately three feet until it stops, resting on a large beam painted bright yellow and red. This creates another 1-inch drop off where the grating ends and the beam begins. The edge of this lower grating is also painted red so that anyone going up the stairs can easily see the red edge, but anyone going down cannot. However, unlike the topmost step, the top of the lower grating has been sprayed yellow from the edge to about three inches into the step. This yellow marking on the top of the second step can be seen by anyone walking either up or down the stairs. (*See* Rec. Doc. 30-7 at 30, 32). The Court acknowledges that there is some dispute as to when the red paint was applied but that dispute is not material because the pictures that Shell has attached to its motion affirm Strong's testimony that one cannot see the red markings as he or she walks down the stairs.
[5] (Rec. Doc. 39 at 1).
[6] (Rec. Doc. 39 at 1).
[7] (Rec. Doc. 39 at 7).

Plaintiff had walked down the stairs with the gap two or three times before, and Strong admitted in deposition that he knew about the gap and had tried to avoid it in the past.[8] Strong testified he stepped into the gap this time because: "Salvador was right in front of me when that happened. I mean I couldn't avoid it much."[9]

On August 8, 2017, Strong filed suit against Shell for its alleged negligence for failing to remedy the hazardous gap in the grating. Strong also claimed in his complaint that Tailing, Shell's safety advisor, was negligent for failing to remedy the hazard or ensure that others would remedy it.[10]

## STANDARD OF LAW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be

---

[8] (Rec. Doc. 30-7 at 8).
[9] (Rec. Doc. 30-7 at 9-10).
[10] (Rec. Doc. 1 at 5).

satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325, *Little*, 37 F.3d at 1075.

## DISCUSSION

The Outer Continental Shelf Lands Act ("OCSLA") applies because Strong fell on a fixed platform located on the Outer Continental Shelf, off the Louisiana coast. *See* 43 U.S.C. § 1333, *et seq.* OCSLA directs the Court to apply the law of the state

adjacent to the controversy, so long as state law is not inconsistent with federal laws and regulations. *See* 43 U.S.C. § 1333(a)(2)(A); *Rodrigue v. Aetna Cas. and Sur. Co.,* 395 U.S. 352, 355 (1969). Neither the parties nor this Court have identified any federal law that conflicts with the Louisiana negligence principles that apply here. Accordingly, Louisiana law controls.

## I. THERE IS A FACTUAL DISPUTE AS TO WHETHER THE HAZARD WAS OPEN AND OBVIOUS

Plaintiff asserts claims against both Shell and Tailing under Louisiana's general negligence statute, La. Civ. Code art. 2315. Plaintiff also cites to La. Civ. Code art. 2317 as another vehicle for finding Shell liable. As Shell acknowledges, the more specific modifying article, La. Civ. Code art. 2322, which refers to buildings, controls this action:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

La. Civ. Code art. 2322; *see also Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 619 (5th Cir. 1983).

Whether a plaintiff is proceeding under article 2322 or article 2315, he must ultimately prove that the defendant owed him a duty. *See Broussard v. State ex rel. Off. of State Bldgs.*, 113 So. 3d 175, 185 (La. 2013), *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So.2d 627, 632–633 (La. 2006). "It is axiomatic that the issue of whether a

duty is owed is a question of law, and the issue of whether a defendant has breached a duty owed is a question of fact." *Broussard*, 113 So. 3d at 185. "Under Louisiana law, a defendant generally does not have a duty to protect against an open and obvious hazard." *Id.* at 184.

Whether the plaintiff knew of a hazard before he was injured by it does not decide this inquiry—although it may provide some evidence that a hazard is open and obvious. *See Dauzat v. Curnest Guillot Logging Inc.*, 995 So. 2d 1184, 1187 (La. 2008) (per curiam). To prohibit recovery, the hazard must be "open and obvious to all, *i.e.*, everyone who may potentially encounter it." *Broussard*, 113 So. 3d at 184. If the hazard should have been as "obvious to a visitor as it was to the landowner," then the "landowner is not liable for an injury which result[ed] from [the] condition." *Dauzat*, 995 So. 2d at 1186.

In this case, it is undisputed that Strong knew of the gap.[11] Reyes, who had been walking with Strong, went so far as to agree at his deposition that "it's obvious . . . that this part of the grating is not there."[12] Moreover, it is uncontroverted that there was yellow paint in the area advising workers exercise caution in taking the stairs. This is relevant, because "[t]he degree to which a danger may be observed by a potential victim is one factor in the determination of whether the condition is unreasonably dangerous." *Id.* However, upon review of the Event Investigation Report,[13] the placement of the yellow paint on the second step suggests to the Court

---

[11] (Rec. Doc. 30-7 at 8).
[12] (Rec. Doc. 30-7 at 39-40).
[13] The Report provides the results of a dual investigation into the incident by Shell and QCP.

that these marks were intended to advise general caution because "[t]his area contained an unusual transition that consisted of multiple, uneven elevation changes."[14] The yellow caution markings do nothing to distinguish the gap—which was created after a handrail was removed—from the rest of the improvised stairs.[15] In fact, from the pictures that Shell provides it appears that someone walking down the stairs would see yellow paint on the edge of the second step, but would not see any markings on the highest-most step, which has the gap that tripped Strong.[16] The yellow markings might even have the effect of drawing a reasonable person's attention *away* from the gap that tripped Strong.

Indeed, this may be the reason the Report concludes that the "actual hazard associated with the transition and the gap . . . was not actually perceived as a hazard to anyone who previously walked over it."[17] Thus, the review team that issued the Report—which included Dale Simmons, the Safety & Security Advisor at Shell—concluded that one reason for Strong's fall, was that "the hazard appeared to be normalized."[18] At his deposition, Simmons reiterated that the gap "was not perceived as a hazard to anyone."[19] Given this evidence, there is a factual question as to whether a reasonable person walking down the stairs would spot the gap and perceive it as a hazard. Summary judgment is inappropriate. *See Howell v. Avante Services,*

---

[14] (Rec. Doc. 39-4 at 5).
[15] Assuming that the red markings on the side of the gratings were (1) added before the fall and (2) were visible to an individual approaching the stairs from the higher elevation, the red markings, like the yellow paint, still do not draw attention to the gap as a particular hazard within the larger hazard of the steps. Accordingly, the "pictures cement further the conclusion that the hole's obviousness is subject to live dispute." *See Manson Gulf, L.L.C v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 136 (5th Cir. 2017).
[16] (*See* Rec. Doc. 30-7 at 29-30) (attached as Appendix, figs. 1-2).
[17] (Rec. Doc. 39-4 at 4).
[18] (Rec. Doc. 39-4 at 4).
[19] (Rec. Doc. 39-3 at 3).

*LLC*, No. CIV.A. 12-293, 2013 WL 1907474, at \*5 (E.D. La. May 8, 2013) (declining to find hole was open and obvious and denying summary judgment because of factual or credibility disputes).

## II. TAILING DID NOT OWE A DUTY TO WARN PLAINTIFF OR REMEDY THE GAP

Although the Court finds that issues of fact preclude a determination at this stage that the hazard was open and obvious, the Court must go on to examine whether Tailing even had a duty to remedy or warn Plaintiff of the gap that caused Plaintiff's fall. Unlike Shell, Tailing is not the owner or operator of the platform. Thus, article 2322 does not apply to Tailing. Nor is Tailing Plaintiff's employer. Plaintiff's only route to holding Tailing accountable lies with the general negligence provision, La. Civ. Code art. 2315: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." This requires the Court to determine whether Tailing owed "an anterior obligation which would make an act constitute fault." *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1156 (La. 1988).

As Code articles 2317 and 2322 make clear, as a default, Louisiana law places the duty to keep property reasonably safe with the property's owner. Nevertheless, a duty not otherwise shouldered on a party may be assumed through contract or by a party's actions. For example, although there is no duty to protect others from criminal acts of third persons, a duty to protect others from such acts may be created by actively taking steps to give such protection. *See Harris v. Pizza Hut of Louisiana,*

*Inc.*, 455 So. 2d 1364, 1372 (La. 1984) (finding restaurant assumed duty to protect patrons from armed robbery attempt by hiring security guard).

Plaintiff's position is that Tailing, through Becker, was responsible for the safety of everyone on the platform. The only evidence of this that Plaintiff provides is the testimony of Juan Reyes. Reyes, Plaintiff's co-worker at QCP, referred to Becker as the "safety guy on the platform."[20] According to Reyes, Becker "would always walk around, make sure everything was right, you know, everybody was working safe. That—That was his job."[21] Plaintiff suggests—although without citation to any caselaw—that by serving as the "safety guy," Becker assumed a duty to notify all contractors who came onto the platform of all the potential hazards.[22] It is undisputed that Becker did not notify Strong of the gap in the grating.

Tailing argues that Becker's duty was to identify hazards and alert Shell personnel to their presence—not anyone else. It is undisputed that Becker identified the gap as a hazard[23] and notified Shell's mechanical inspector, Miguel Deshotel, of it.[24] The uncontradicted testimony of Becker confirms that his role was to advise Shell of safety hazards, nothing more. In fact, Strong quotes several excerpts from Becker's deposition which substantiate this. When asked, "[D]id you expect that [Shell] would fix that condition after you identified it to them?" Becker responded, "What they do, that's [Shell's] job."[25] Becker never wavered from this position that his "job is to

---

[20] (Rec. Doc. 40-4 at 2).
[21] (Rec. Doc. 40-4 at 3).
[22] (Rec. Doc. 40 at 7).
[23] (Rec. Doc. 40 at 4).
[24] (Rec. Doc. 33-9 at 16-17).
[25] (Rec. Doc. 40 at 4).

inspect and advise" Shell.[26] Reyes' testimony does not contradict Becker's as to the scope of Becker's responsibilities. Becker, testified he served as a "Safety Coach" and his primary job was to observe the crew "to make sure they are working in a safe manner under Shell standards."[27] He can reasonably be called the "safety guy." However, there is no evidence—not in any cited deposition testimony of Becker or Reyes—that Becker's role was to *correct* any conduct not consistent with Shell's safety standards. Rather, Becker's job was to advise the person-in-charge of the platform, so that Shell could properly address the hazard.[28]

Tailing had no legal duty to warn Strong of the hazard because there is no evidence that Tailing ever accepted such an obligation by conduct or by contract. Tailing was hired by Shell to report hazards to Shell.[29] This, Becker did. Louisiana courts consistently refuse to balloon the scope of duty of those hired for one safety related purpose to include obligations to protect third parties from *any* hazard that might befall them, where the defendant did not accept that specific obligation. *See, e.g., Arthur v. City of DeRidder*, 799 So. 2d 589, 593 (La. App. 3d Cir. 2001) (finding police department had no duty to protect pedestrians crossing the street from an attraction merely because the department had agreed to "keep the peace" at the event), *Johnson v. Gilmore*, 771 So. 2d 662, 664 (La. App. 3d Cir. 2000) (accord). Because there is no evidence that Tailing assumed a duty to remedy the hazard or

---

[26] (Rec. Doc. 40 at 5).

[27] (Rec. Doc. 33-9 at 6)

[28] (Rec. Doc. 33-9 at 15).

[29] Plaintiff suggests offhand that Becker's failure to identify the gap as a hazard in a Daily Inspection Report constituted its own breach of this duty, but Plaintiff seemingly admits this omission was inconsequential because Becker had already notified Shell of the hazard.

warn third-party contractors of it, summary judgment is appropriate in favor of Tailing.

**CONCLUSION**

Accordingly,

**IT IS HERBY ORDERED** that Shell's *Motion for Summary Judgment* **(Rec. Doc. 30)** is **DENIED**.

**IT IS FURTHER ORDERED** that Tailing's *Motion for Summary Judgment* **(Rec. Doc. 33)** is **GRANTED**. Tailing shall be dismissed from this proceeding with prejudice.

New Orleans, Louisiana, this 6th day of March, 2019.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE